UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MARIE ELIAS, as Administrator of the Estate
of Herve Jules a/k/a Herve Gilles and MARIE
ELIAS, individually,

               Plaintiffs,

      - against -

VILLAGE OF SPRING VALLEY, THE
SPRING VALLEY POLICE DEPARTMENT,
and POLICE OFFICER JOHN ROPER,

               Defendants.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/26/15

**OPINION AND ORDER**

**12-cv-6846 (SAS)**

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.    INTRODUCTION

On December 14, 2011, at about three-thirty in the morning, Spring Valley Police Officer John Roper shot Herve Gillis twice, killing him.[1] Officer Roper is the only witness to the shooting.[2]

Marie Elias brings this suit against Officer Roper and the Village of

---

[1]    For the purposes of this Opinion and Order, Herve Jules, also known as Herve Gilles, will be referred to as "Gilles," and Marie Elias will be referred to as "plaintiff."

[2]    Nor is there a video or audio recording that captures the incident.

1

Spring Valley[3] under section 1983 of Title 42 of the United States Code ("section 1983"), alleging that Gilles's Fourth and Fourteenth Amendment rights were violated by Officer Roper's use of deadly force.[4]  Defendants now move for summary judgment on grounds that Officer Roper's use of deadly force in self-defense was objectively reasonable under the Fourth Amendment and that plaintiff has not presented evidence of municipal liability.  For the reasons set forth below, defendants' motion is GRANTED.

## II.    BACKGROUND[5]

### A.    Officer Roper's Prior Interactions with Herve Gilles

Herve Gilles came to the United States from Haiti in the early 1980s.[6] He was forty-eight years old when he was killed.[7]  Officer Roper has been at the

---

[3]     Plaintiff has stipulated to the dismissal of defendant Spring Valley Police Department.

[4]     Plaintiff also brings common law claims for wrongful death and negligence.

[5]     The facts recited below are drawn from the pleadings, the parties' Local Civil Rule 56.1 Statements, the declarations submitted in connection with this motion, and the exhibits attached thereto.  These facts are undisputed unless otherwise noted.  Where disputed, the facts are viewed in the light most favorable to the nonmoving party.  *See Beard v. Banks*, 548 U.S. 521, 529-30 (2006).

[6]     *See* Defendants' Local Rule 56.1 Statement ("Def. 56.1") ¶ 1.

[7]     *See id.* ¶ 2.

Spring Valley Police Department since 2000.[8]

Prior to December 14, 2011, Officer Roper was told by other officers that (1) Gilles had mental health issues, (2) Gilles was involved in incidents in which he used weapons and engaged in threatening behavior, and (3) Gilles threatened another officer with a knife.[9]  Officer Roper also had at least three prior personal encounters with Gilles.[10]  Based on these interactions, Officer Roper believed that Gilles was mentally ill.[11]  He therefore responded to calls involving Gilles with a heightened perception of potential danger.[12]

On one occasion, Gilles collapsed on the floor at the police station and lay motionless "as if he had been shut off like a robot."[13]  On another, Gilles was collected and lucid while Officer Roper interviewed him as a potential witness to a robbery.[14]

Officer Roper was also one of several officers who responded to an

---

[8]     *See id.* ¶¶ 10-12.

[9]     *See id.* ¶¶ 25-27.

[10]    *See id.* ¶ 29.

[11]    *See id.* ¶ 28.

[12]    *See id.* ¶ 40.

[13]    *Id.* ¶ 31.

[14]    *See id.* ¶¶ 32-33.

incident in which Gilles was threatening people with a cane.  Officer Roper and other police officers circled Gilles and told him to put down the cane.  Gilles initially refused but later complied and was handcuffed.[15]  Rather than arrest Gilles, the officers took him to Good Samaritan Hospital for treatment, "because they knew of Mr. Gilles' previous mental health issues and because he threatened to harm others with his cane."[16]

### B.    First Dispatch on December 14, 2011

During the December 14, 2011 midnight shift, four patrol officers and one patrol sergeant were on duty.[17]  Between two and two-thirty in the morning, Chaim Rosenberg, the bouncer at the El Buen Gusto bar, called the police and told them that Gilles was causing a disturbance at the door.  Dispatch informed Officer Roper of a reported disorderly customer trying to enter the bar.

Officer Roper was the first to arrive; Officer Rosenbaum arrived second.  When Officer Roper arrived, Gilles was standing in the parking lot of a nearby bus station.  Officer Roper recognized Gilles and drove his car towards the

---

[15]     *See id.* ¶¶ 34-37.

[16]     *Id.* ¶ 39.  Spring Valley Police Officers regularly transport individuals exhibiting mental health issues to Good Samaritan Hospital to be evaluated.  *See id.* ¶ 38.

[17]     *See id.* ¶ 41.  The officers were Roper, Frank Gulla, Marta Rodriguez, and Lech Rosenbaum.  Sergent Charles Schnaars was also on duty.  *See id.* ¶ 42.

parking lot; he also radioed Officer Gulla.

Officer Roper approached Gilles while driving, calling out to get his attention. Officer Roper thought Gilles appeared to be aggressive; and he was uttering things that were unintelligible to Officer Roper. Gilles continued to walk without stopping while Officer Roper followed him in his car. Gilles entered a store and exited a short time later with a paper bag containing what appeared to be a bottle. Officer Roper then told him to go home and get some rest, to which Gilles again said something unintelligible to Officer Roper. Officer Roper followed Gilles until her turned onto another street. Approximately seven minutes passed from the time Officer Roper received the call from Dispatch to the time he stopped following Gilles.[18]

### C.    The Shooting

About forty-five minutes to an hour later, Gilles returned to El Buen Gusto. According to Rosenberg, Gilles cursed at him and threatened to shoot him while gesturing with his hand as if he were holding a rifle. Rosenberg called the police after seeing Gilles approach the back of El Buen Gusto with a rock in his hand.[19]

---

[18]    *See id.* ¶¶ 43-59.

[19]    *See id.* ¶¶ 60-62.

Officer Gulla dispatched Officer Roper and Officer Rodriguez, stating that Gilles had returned to the bar and was throwing rocks.[20]  Rosenberg told Officer Roper, who arrived before Officer Rodriguez, that Gilles was throwing rocks.  Officer Roper remained in his car, but saw that Gilles was standing in the parking lot of a church approximately sixty to seventy feet away.[21]

Officer Roper then drove into the dimly lit parking lot.  After doing so, he saw Gilles walking towards him.[22]  Officer Roper called over his radio that he "was out with him," and then got out of his car.[23]  Officer Roper stated that he did not wait for backup to exit his vehicle because he believed that he could handle the situation on his own.[24]

Officer Roper brought his wooden baton with him for protection because he was familiar with Gilles's history of erratic behavior.  Officer Roper told Gilles to stop, turn around, and place his hands on his head.  Gilles did not comply.  Instead, Gilles continued to approach Officer Roper.[25]  When Officer

---

[20]     *See id.* ¶¶ 65-67.

[21]     *See id.* ¶¶ 70-72.

[22]     *See id.* ¶¶ 73-76.

[23]     *Id.* ¶ 77.

[24]     *See id.* ¶ 79.

[25]     *See id.* ¶¶ 81, 86, 87-88.

Roper believed Gilles's proximity threatened his safety, he struck Gilles on his left leg with the baton.  He did so with the intent to stun Gilles so that he could gain control and handcuff him.[26]

But Gilles absorbed the blow and then rushed at Officer Roper, knocking him to the ground, so that Officer Roper landed on his back.  The two men then fought, pushed, and tried to grab control of the baton.[27]  Officer Roper broke free, and got to his feet.  However, Gilles was holding one end of the baton with his left hand while Officer Roper held the other end of the baton with his right hand.  The two men engaged in a struggle for the baton, eventually falling back to the ground, and alternately rolling on top of one another.[28]  Officer Roper could not let go of the baton to access his radio to call for backup or to get his Taser because he did not want to risk releasing the baton and allowing Gilles to attack him using the baton.[29]

At a certain point during this struggle, Officer Roper straddled Gilles with his legs, pinning him down.  After a few moments, Officer Roper felt Gilles

---

[26]     *See id.* ¶¶ 89-90.

[27]     *See id.* ¶¶ 91-95.

[28]     *See id.* ¶¶ 97-99.

[29]     *See id.* ¶¶ 100-101.

relax his body and heard him say, "You go me."[30]  As Officer Roper was

contemplating how to handcuff Gilles, Gilles bucked and threw Officer Roper off.

Officer Roper again landed with his back on the pavement, and he and Gilles

resumed their fight for the baton.  During the struggle that followed, the men

alternately were standing and on the ground.[31]

Eventually Officer Roper straddled Gilles a second time.  But Gilles

bit the officer on the thigh and threw him on his back again.  Gilles got to his feet,

and the two men fought over the baton once more.  Gilles broke Officer Roper's

right-hand grip on the baton.  Believing he could not hold onto the baton much

longer, and desperate to get Gilles to stop fighting, Officer Roper told Gilles he

would shoot him if Gilles did not stop, but did not draw his firearm while giving

this warning.[32]

Gilles responded, "You going to shoot me!  You going to shoot me!"[33]

A moment later, Gilles wrested the baton from Officer Roper's grasp, and swung it

towards Officer Roper's head and face.  Officer Roper raised his arms to protect

---

[30]     *Id.* ¶ 102.

[31]     *See id.* ¶¶ 104-107.

[32]     *See id.* ¶¶ 108-115.

[33]     *Id.* ¶ 116.

himself from the blows.  As a result, Gilles struck Officer Roper in his left forearm and elbow, which caused severe pain and impaired Officer Roper's left arm. Officer Roper believed that Gilles was going to strike him with the baton again. He believed that if he did, Gilles could kill him or render him unconscious and defenseless.[34]

To protect himself from a potentially fatal blow, Officer Roper drew his service pistol from his holster and fired one round at Gilles's torso.  Officer Roper did not see if the shot killed Gilles.  After Officer Roper fired, Gilles continued to lunge toward Officer Roper as if he was going to jump on him. Officer Roper fired a second round at Gilles.  Gilles stopped moving after the second shot and came to rest on the pavement next to Officer Roper.  Officer Roper saw that one of the rounds hit Gilles in the head and appeared to have killed him.  Officer Roper then radioed for assistance, transmitting that shots had been fired and calling for an ambulance.[35]

### D.   Events Following the Shooting

Officer Rodriguez testified that she heard gunshots after a brief

---

[34]     *See id.* ¶¶ 117-122.

[35]     *See id.* ¶¶ 123-129.

conversation with Rosenberg.[36]  Officer Rodriguez then drove to the parking lot, and, with the assistance of another officer who arrived after she did, cordoned off most of the parking lot with crime scene tape.  Officer Roper, accompanied by Officer Rodriguez, was transported by ambulance to Good Samaritan Hospital to be treated for injuries to his arm.[37]  The following day, Officer Roper's own physician treated him for the bite wound to his thigh.[38]

Officer Rodriguez and Detective Halligan, canvassed the neighborhood to look for potential witnesses to the shooting.  They did not find any.  Investigations by the Spring Valley Police Department and the Office of the Rockland County District Attorney also failed to locate any witnesses to the shooting or video recordings that captured it.[39]

## III.   LEGAL STANDARD

Summary judgment is appropriate "only where, construing all the evidence in the light most favorable to the non-movant and drawing all reasonable inferences in that party's favor, there is 'no genuine issue as to any material fact

---

[36]      Rosenberg testified that he heard gunshots before he spoke to Officer Rodriguez.  *See id.* ¶ 137.

[37]      *See id.* ¶¶ 136, 138-141.

[38]      *See id.* ¶ 144.

[39]      *See id.* ¶¶ 142-143.

and . . . the movant is entitled to judgment as a matter of law.'"[40]  "A fact is material if it might affect the outcome of the suit under the governing law, and an issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[41]

"[T]he moving party has the burden of showing that no genuine issue of material fact exists and that the undisputed facts entitle [it] to judgment as a matter of law."[42]  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts,"[43] and "may not rely on conclusory allegations or unsubstantiated speculation."[44]

In deciding a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual

---

[40]    *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 19 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(c)) (some quotation marks omitted).

[41]    *Windsor v. United States*, 699 F.3d 169, 192 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (quotations and alterations omitted).

[42]    *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) (citations omitted).

[43]    *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (quotation marks and citations omitted).

[44]    *Id.* (quotation marks and citations omitted).

issues to be tried."[45]  "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[46]

"[G]iven the difficult problem posed by a suit for the use of deadly force, in which 'the witness most likely to contradict [the police officer's] story — the person shot dead — is unable to testify[,] . . . . the court may not simply accept what may be a self-serving account by the police officer.'"[47]  Instead, courts "must also consider 'circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably.'"[48]  In doing so, the court should consider all of the evidence, including forensic evidence, and take "'a fairly critical assessment of [ ] the officer's original reports or statements . . . to decide whether

---

[45]     *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 119 (2d Cir. 2012).

[46]     *Barrows v. Seneca Foods Corp.*, 512 Fed. App'x 115, 117 (2d Cir. 2013) (quoting *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012)).

[47]     *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 37 (2d Cir. 2003) (alterations in original) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

[48]     *Id.* (quoting *Scott*, 39 F.3d at 915).

the officer's testimony could reasonably be rejected at a trial.'"[49]

## IV.   APPLICABLE LAW

### A.   Section 1983

Section 1983 states, in relevant part, that

[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Section 1983 "does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere."[50]  "The purpose of [section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."[51]

---

[49]      *Id.* (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994)).

[50]      *Morris-Hayes v. Board of Educ. of Chester Union Free Sch. Dist.*, 423 F.3d 153, 158-59 (2d Cir. 2005) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).  *Accord Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("'[O]ne cannot go into court and claim a violation of § 1983 — for § 1983 by itself does not protect anyone against anything.'") (quoting *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979)).

[51]      *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).

In order to have recourse against a municipality under section 1983, a plaintiff "must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury."[52]  Any form of liability under section 1983 requires direct involvement by the defendant in causing the plaintiff's damages.[53]  "Because vicarious liability is inapplicable to . . . [section] 1983 suits, a plaintiff must [prove] that each Government-official defendant, through the official's own individual actions, has violated the Constitution."[54]

**B.    Deadly Force**

When excessive force is used in the context of "making an arrest, investigatory stop, or other 'seizure' of his person . . . . such claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard."[55]  The Supreme Court has noted that the Fourth Amendment is not amenable "to an easy-to-apply legal test" and instead requires a court to "slosh [its] way through the factbound morass of

---

[52]    *Cash v. County of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (quoting *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)).

[53]    *See Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009).

[54]    *Id.* (citations omitted).

[55]    *Graham v. Connor*, 490 U.S. 386, 394 (1989).  For this reason, plaintiff's claim under the Fourteenth Amendment cannot be sustained and is hereby dismissed.

14

'reasonableness.'"[56]  According to the Second Circuit, "[i]t is not objectively

reasonable for an officer to use deadly force . . . unless the officer has probable

cause to believe that the suspect poses a significant threat of death or serious

physical injury to the officer or others."[57]

       "The calculus of reasonableness must embody allowance for the fact

that police officers are often forced to make split-second judgments — in

circumstances that are tense, uncertain, and rapidly evolving — about the amount

of force that is necessary in a particular situation."[58]  Thus, "[i]n all cases, the

reasonableness of the officer's decision to use force . . . 'depends only upon the

---

[56]     *Scott v. Harris*, 550 U.S. 372, 383 (2007).

[57]     *O'Bert*, 331 F.3d at 36.  *Accord Scott*, 550 U.S. at 386 (holding that officer was entitled to summary judgment because his use of deadly force was reasonable where respondent initiated a car chase that "posed a substantial and immediate risk of serious physical injury to others[, and] no reasonable jury could conclude otherwise"); *Tennessee v. Garner*, 471 U.S. 1, 11 (1985) ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."); *Costello v. Town of Warwick*, 273 Fed. App'x 118, 119 (2d Cir. 2008) ("[T]o survive summary judgment [in a deadly force case], the [plaintiff must] raise a material question of fact as to whether [the officer's] decision to use deadly force was 'objectively reasonable,' or in other words, whether he had 'probable cause to believe that [the plaintiff] pose[d] a significant threat of death or serious physical injury to [himself] or others.'") (quoting *Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 762 (2d Cir. 2003)).

[58]     *Graham*, 490 U.S. at 396-97.

officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force.'"[59]

## V.    DISCUSSION

### A.    No Fourth Amendment Violation

#### 1.    The Use of Deadly Force Was Objectively Reasonable

If true, Officer Roper's account of the shooting does not support a claim under the Fourth Amendment.  It was objectively reasonable for Officer Roper to use deadly force in self-defense.  He was in a continuing violent struggle with Gilles, who was then armed with Officer Roper's own baton.[60]

Plaintiff suggests that had Officer Roper simply waited for more officers to arrive before confronting Gilles, the use of deadly force would not have been necessary.[61]  Plaintiff also stresses that Officer Roper was well aware of Gilles's erratic and violent behavior, which calls into doubt the wisdom of

---

[59]    *Nimely v. City of New York*, 414 F.3d 381, 390-91 (2d Cir. 2005) (quoting *Cowan*, 352 F.3d at 762).

[60]     *See, e.g.*, *O'Bert*, 331 F.3d at 36; *Salim v. Proulx*, 93 F.3d 86, 91 (2d Cir. 1996) (explaining that where an officer uses deadly force, the "'immediate threat' criterion controls the outcome of this Court's evaluation") (citing *Garner*, 471 U.S. at 11-12).

[61]    *See* Plaintiff's Memorandum of Law in Support of Opposition to Motion for Summary Judgment ("Pl. Opp."), at 19.  Plaintiff also postulates other scenarios.

16

proceeding alone.[62]  While plaintiff is likely correct that Officer Roper should have waited for other officers to arrive, it is, at least in this case, irrelevant to an assessment of Fourth Amendment reasonableness.  That assessment depends on the split-second decision made by Officer Roper at the moment he was stripped of his baton and faced with the threat of serious injury or death.[63]

## 2.    There Are No Genuine Disputes of Material Fact

Defendants are entitled to summary judgment because there is no *genuine* dispute of material fact concerning Officer Roper's decision to use deadly force in self-defense.  Plaintiff admits each paragraph in defendants' Local Rule 56.1 Statement that concerns whether Officer Roper's use of deadly force was reasonable.  And plaintiff has not identified any internal inconsistencies in Officer Roper's testimony or any other forensic, circumstantial, or testimonial evidence that casts doubt upon Officer Roper's account of the shooting.

Plaintiff admits all but three of the one-hundred-and-forty-four numbered paragraphs in defendants' Rule 56.1 Statement — leaving only two disagreements.  The first difference of opinion concerns whether Officer Rodriguez arrived at the scene and spoke with Rosenberg before or after Officer Roper fired

---

[62]    *See id.* at 16-17.

[63]    *See, e.g.*, *Nimely*, 414 F.3d at 390-91.

17

his weapon.[64]  Based on this, plaintiff argues that "the contents of [Officer Rodriguez's] transcript raise some issues regarding the time line provided by Defendants."[65]  These minor discrepancies in the time-line are irrelevant.  They do not touch on the issue of whether Officer Roper had probable cause to believe Gilles posed a serious threat to him justifying the use of deadly force.[66]

The second disagreement relates to whether Gilles had the baton in his hand *after* he was shot.  Plaintiff contends that "Officer Rodriguez stated that she never saw anything of Officer Roper's in [Gilles's] possession."[67]  And plaintiff submits crime scene photographs of Gilles's body without the baton in his hand.

Plaintiff overreaches in an attempt to create a genuine dispute where none exists.  Dean Golemis, a former detective for the Rockland County Bureau of Investigation, is the source of each of the post-shooting photographs relied on by the parties.  He has submitted an affidavit that explains that he photographed

---

[64]     *See* Plaintiff's Statement of Material Facts in Opposition to Defendants' Motion for Summary Judgment Pursuant to Local Rule 56.1 ("Pl. Opp. 56.1") ¶¶ 134, 135 ("Officer Rodriguez stated that she spoke to Chaim Rosenberg before hearing gun shots fired, while Chaim Rosenberg stated that he pointed towards the parking lot after hearing the shots.").

[65]     Pl. Opp. at 11.

[66]     At most, they would provide fodder for cross-examination of Officer Rodriguez or Rosenberg.

[67]     *See* Pl. Opp. 56.1 ¶ 138.

Gilles's right hand *with* and *without* the baton.  Specifically, he states that when he

arrived the baton was in Gilles's right hand, he photographed the hand with the

baton, and then, after removing the baton, photographed Gilles's hand without the

baton.[68]  Consistent with this, the record contains photographs that depict the baton

in Gilles's right hand as well as photographs in which Gilles's hands are empty.[69]

Likewise, plaintiff's characterization of Officer Rodriguez's testimony

is misleading.  The testimony plaintiff relies on is:

> Q.   Did you see anything in [Gilles's] possession that was the
> property of Officer Roper's [*sic*]?
>
> A.   I didn't.  Besides, when I saw him, when I, you know, with
> the cruiser, that was the only time that I looked at him, and
> I didn't — I, you know, I wasn't trying to look for him, so
> nothing stood out for me, you know.[70]

To the extent this testimony is not equivocal, it is insufficient — "[t]he mere

existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could *reasonably* find for

---

[68]     *See* 7/31/14 Affidavit of Detective Golemis, Ex. S to 8/8/14
Declaration of Kevin Levine, Defendants' attorney.

[69]     Evidence calling into question the authenticity of the photographs or
the placement of the baton in Gilles's hand following the incident as well as
myriad other types of possible circumstantial evidence might well be sufficient to
create a genuine dispute of material fact, but no such evidence has been presented.

[70]     11/26/13 Deposition Testimony of Officer Marta Rodriguez, Ex. I to
Defendants' Motion for Summary Judgment, at 108-109.

the plaintiff."[71]

Plaintiff also links Officer Rodriguez's testimony with the timing of Officer Roper's incident report, which was generated three days after the shooting and subsequent to meetings with his union representatives.[72]  In this way, plaintiff suggests that Officer Roper fabricated his account and then, with the help of others, took measures to conform the evidence to his story.

But this evidence — that Officer Rodriguez does not recall seeing Officer Roper's "property" in Gilles's hand, that there are small discrepancies in the time line, that Officer Roper met with union representatives and issued his report three days after the shooting — does not contradict Officer Roper's contemporaneous account of the incident.  This evidence may be sufficient to give rise to an *insinuation*,[73] but it is not sufficient to allow a *reasonable inference* to a competing version of events in which Officer Roper did not have probable cause to

---

[71]     *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quotation marks omitted) (emphasis in original).

[72]     *See* Pl. Opp. at 12.

[73]     For example:  Officer Roper met with union officials, *therefore they must have concocted a story with him* or Officer Rodriguez did not see the baton in Gilles's hand, *therefore Officer Roper must have lied about Gilles having attacked him with the baton.*

use deadly force.[74]  At the summary judgment stage, a nonmoving party "'must offer some hard evidence showing that its version of the events is not wholly fanciful.'"[75]

In sum, I have reviewed Officer Roper's deposition testimony, his statements, and the circumstantial evidence in the record to determine "whether this evidence could convince a rational factfinder that the officer acted unreasonably."[76]  However, there are no relevant inconsistencies and this record does not permit an inference that Officer Roper acted unreasonably.  In addition, because I conclude that there is no evidence that Gilles's Fourth Amendment rights were violated, I need not address qualified immunity.[77]

---

[74]  For instance, evidence of the medical records or the testimony of a ballistics expert might have been presented to suggest that Officer Roper was *not* hit with his baton or that Gilles was *not* standing over Officer Roper just before Officer Roper shot him.  Likewise, some evidence concerning whether it would have been expected that the baton should or should not have been in Gilles's hand after being shot would have been helpful.  Without this, there is no way to know whether the mere absence of a baton in Gilles's hand *after* having been shot actually impeaches Officer Roper's testimony that Gilles had the baton in his hand *before* he was shot twice and killed.

[75]  *Jeffreys*, 426 F.3d at 554 (quoting *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)).

[76]  *O'Bert*, 331 F.3d at 37 (quotation marks omitted).

[77]  In any event, a qualified immunity analysis would likely favor Officer Roper because, at minimum, reasonable officers could disagree over whether the use of deadly force here was permissible.  *See Brosseau v. Haugen*, 543 U.S. 194,

**B.     There Is No Evidence to Support Claims for Municipal Liability**

Plaintiff also has no section 1983 claim predicated on municipal liability.  *First*, Gilles's rights under the Fourth Amendment were not violated. *Second*, even if his constitutional rights had been violated, there is no evidence to suggest that Officer Roper's training was the "moving force" behind the constitutional deprivation.[78]

**C.     State Law Claims**

Because there are no remaining federal claims, I decline to exercise supplemental jurisdiction over plaintiff's remaining state law claims.[79]

**VI.    CONCLUSION**

For the reasons set forth above, defendants' motion for summary judgment is GRANTED.  The Clerk of the Court is directed to close this motion

---

198 (2004) ("Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.") (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

[78]     *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989).  For this reason, I have not recounted the factual allegations concerning the Spring Valley Police Department's use of force policy or Officer Roper's training.  *See, e.g.*, Def. 56.1 ¶¶ 15-24; Pl. Opp. at 2-3.

[79]     *See Pitchell v. Callan*, 13 F.3d 545, 549 (2d Cir. 1994) (stating that "it is axiomatic that a court should decline to exercise jurisdiction over state-law claims when it dismisses the federal claims prior to trial").

[Docket No. 19] and this case.

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            January 26, 2015

## -Appearances-

**For Plaintiffs:**

Sanford Alan Rubenstein, Esq.
Brian Zwaig, Esq.
Rubenstein and Rynecki
16 Court Street, Suite 1717
Brooklyn, NY 11241
(718) 522-1020

**For Defendants:**

Brian S. Sokoloff, Esq.
Susan H. Odessky, Esq.
Kevin Levine, Esq.
Sokoloff Stern LLP
179 Westbury Avenue
Carle Place, NY 11514
(516) 334-4500